Good morning, your honors. My name is Pam Thomas-Sherrill and I represent the appellate Michael Nielsen. Your honor, the issue presented in this case, I believe, is, you know, what does an American citizen have to do to terminate a consensual encounter with the police? In this case, we are arguing that what started out as a consensual encounter with Mr. Nielsen and the police, you know, he cooperated with them. They asked him if they could search his luggage when it came down to the baggage carousel at the Honolulu International Airport. He, in fact, unzippered his two checked-in pieces of luggage for them. He allowed them to search his bags. They suspected him of carrying methamphetamine. No drugs were found in either of his bags. The officer said, thank you, Mr. Nielsen. End of consensual encounter. Mr. Nielsen should have been free to go, but what the officers do... And he was. Wasn't he free to go? He went. They follow him. They follow him. This was in a public area? Yes. They had a right to be in, the officers had a right to walk in that area? That is true. And so did he. Right. But, you know, but they follow him. They, by their conduct, you know, a reasonable person would not believe that they were free to leave because... But didn't he tell me that he was free to leave? At the very beginning? At the very beginning, right. And, in fact, they thanked him after. So consensual encounters... So did he now become less free to leave when he actually left? Yes, but I guess, so he was trying to leave, but they follow him. He knows they're following him. At some point, they're like five feet within, you know, they're close enough, they can eavesdrop, they can hear what he's saying on his phone. Ms. Amashiro? Yes. I have two problems with your case. Okay. Okay. The first is that you didn't argue to the district court below that it was, that the arrest occurred prior to the taxicab stand, and secondly, that we have a factual finding based on an investigation of the custody until the taxicab stand. So, assuming, how do you get over those two hurdles to convince us that we should reverse here? With respect to it, that is true. I did not explicitly argue that he was subject to some kind of Fourth Amendment seizure prior to the taxicab station. Perhaps I was too cautious in that position, because you know, arguably, even at the taxicab station, they did not have reasonable suspicion at that point to detain him. I'm not answering your question. At that point, they knew one major additional fact, which was that the explanation that he had given, the innocent explanation for why he would have gone to his truck and moved it was by his own action, not so. That is true, Your Honor. Although, as you were in reading the record, Mr. Nielsen also had some black pearls in the vehicle, and there was conversation later on that he was worried about the legality or illegality of the black pearls. But that's not the point. What they knew at that point was that he was not subject to the Seizure Act. At that point, once they knew that he wasn't going to drive that truck, was that he went to the truck and moved it for some reason, other than that he had heavy bags and was going to put them in the truck. In the police officer's minds. I mean, but prior to even searching the truck, I mean, they now know that there might have been another reason why he was he didn't want them to go to the truck. That is because of the black pearl. But they don't know that at the point they detained him. At the taxi cab station. Right. Well, the reason why. All they need at that point is reasonable suspicion.  Taxi cab station. You know, I guess my answer to that is that I don't think that there was reasonable suspicion, given the fact that once they stop him at the baggage carousel, all the evidence that starts to, well, most of the evidence starts to be exculpatory. Except that the information that they had was not that it was in his bags, it was on his body. Right. Therefore, they didn't expect to find it in his bags and they didn't. It's not inconsistent with anything that they thought. They knew. That was where their attention was focused. But if we go back to. That corroborated the informant. But if we go back to the informant, I mean, the informant's information was never corroborated. Yes, there were details that matched. I mean, there were specific. There was specific information given by the confidential source that matched. No question about that. I mean, they were able to locate the truck on August 11th, the second encounter. But, you know, I think what's significant is that, yes, all the information matched. But, you know, they never found distribution quantity of drugs on Mr. Nielsen. So the information provided by the confidential source. Details matched up on the first encounter. Details matched up on the date of arrest. But the crucial fact of whether he actually was possessing distributorship quantities of methamphetamine was never corroborated. I think if he hadn't gone to the truck directly from the airplane, he'd be on much better ground. But he did go to the truck directly from the airplane. And he moved the truck. And now he wasn't going to use the truck. So what was he doing in the truck? He was depositing the black pearls in the truck, perhaps. I mean, you know, that is... Perhaps, but we only need reasonable suspicion. Right. But I think, you know, the police may have had reasonable suspicion to believe that there were drugs in the truck. But I don't, you know... Counsel... Yeah. Neither side cited to us what I thought was the controlling Supreme Court case. Involving the tip to the drug agent that arriving in Chicago on such and such a train is the defendant and he's going to be carrying heroin. And the agent goes to the train station. And lo and behold, emerging from the train at just the hour the informant predicted is the defendant. And the officer finds heroin on the person. Why doesn't that case also control with regard to the corroboration that the agents had previously done? In connection with the money, the prior incident where he'd been found in large sums of money. I mean, everything the informant told him checked out. Except for that crucial fact, Judge. Well, but we now know that he wasn't depositing black pearls in his truck. He was probably removing the drugs that were on his person and secreting them in his truck. From which he then tried to divert the attention of the agents when they questioned him. So everything checks out. Well, everything except, I mean, I know this is a fact subsequent to the taxicab station. But the dog doesn't alert. I'm sorry, I didn't hear, what was that? You know, the dog doesn't alert again to the truck. Could be explanation. So, I mean, the black pearls story becomes more credible. First of all, I mean, they don't have to negate every possibility. I mean, he could have had who knows what he had there. He could have had stolen goods. But on the other hand, they had some reason to think he had drugs. And so why, I mean, one thing to be said is if he did illegally have black pearls, that would still be a reason to detain him. So in other words, he thought he had illegally had black pearls is really what he's saying. Perhaps, yeah, right. But in any event, why, they didn't even know that at the time. The black pearl story didn't show up until after that. After the taxicab station, yes. So it doesn't seem pertinent to anything except to how much they have to negate of other possibilities before they have reasonable suspicion. Well, I can, you know, and I may just be beating a dead horse here, but, I mean, if you go back to the confidential source tip, the lack of the ultimate find of any distributorship quantities of drugs. First time. The fact that they did find a lot of money, but they never found the drugs. And as the court is aware, you know, they catch him both times, going and coming on the first trip. And when he does come back on the, based upon the first tip, he's carrying the documents to show that he purchased two cars. I mean, obviously, what happened was that the whole police team got screwed up because the TSA found the money. They were going to let him go through with the money. And so at that point, he knew he was being watched. Of course, he wouldn't come back with the drugs. Right. But I guess, Judge, from an objective standpoint, I mean, you know, and without the insight of hindsight, I mean, you know, an innocent, it could be construed, it is innocent conduct, right? I mean, just because you carry large sums of cash. They did find some drugs in his, not a distributable quantity, and not arrestable, but they found some drugs, which also corroborates. Right. And that is corroboration. Right. You kind of, that point was kind of glossed over a little bit. But I don't think it was lost on the district court. Well, and, you know, without knowing the answer to the question about, I mean, you know, did they ever field test the stuff? I mean, that's what they claimed, that, you know, it was just loose powder in a shaving kit. There was no evidence that they actually field tested it for the presence of methamphetamine. You know, I mean, so, and I didn't want to ask because I didn't know the answer to the question. I understand. But I know that, you know, but I think this is a close case about the search of the truck or the, well, I guess the consent. And, you know, I think the preference would have been to go get a warrant. That's what the warrant requirement is all about. And finally, my time's up. Well, they could have gotten a warrant on the truck. Right. But as far as getting a warrant for him, he was leaving. Right. But it's not like they did, I mean, they knew who he was. I mean, they had been trying to get him for a couple, you know, for a time. They knew, I mean, you know, he wasn't a stranger to them. And I know my time is up. But if I can just, I was going to say one more thing. Quickly, please. That I can't, that escapes me. Maybe I'll do it in rebuttal. Thank you very much. All right. Thank you. Thank you, counsel. Good morning. My name is Michael Kawahara, assistant United States attorney, representing the plaintiff of Pele in this case. Just to let the court know, my wife told me this morning that I'm not, I'm not focusing or my eyes don't appear to be focusing on anyone. This past Sunday, I was playing with my dog who poked me in the eye. So I'm just getting over that. I just wanted to let the court know. My wife, of course, tells me I never listen to her anyhow. But I said I had an excuse. I just wanted to let the court know, in case that does, if my eyes appear to drift off, that, that, I'm still trying to get over that. But just tell me, you mentioned the case, that Chicago case, I think you're talking about the Draper case. I couldn't remember whether it was Draper or Spolota. I believe it is Draper. I didn't want to display my ignorance. And that's the one that talks about an informant tip being corroborated by or substantially corroborated by independent investigation. It's the notion that has been used in the anonymous tipster line of cases about predictive corroboration. And I would have cited Draper in this case had the situation been that defendant, when first approached by officers Nakasone and Kobayashi for the consensual encounter and baggage claim, if they had approached him, asked to talk to him, and basically defendant at that point told him to pound sand. I think pound sand. And at that point, I think there would have been, based upon what the officers had seen, particularly defendant's conduct with respect to going directly to his pickup truck, staying there for a period of time, and with the tip indicating that he was body carrying it, there could have been, the officers could very well have suspected that he was using that time in the truck after he moved it to remove the drugs and place them in the truck, then come back to the terminal now that he no longer is possession of it. But in this sense, I mean, essentially the way, and putting waiver issues aside, the way the defendant is now arguing the case, he's approximately moved the seizure back to that same time period, right? Yes. And that's where I have a problem. So my question is, and the problem, presumably, is that they told him he was free to leave and he did walk away, and why is he being seized? But we also know, I think, isn't there something in the record where they say if at any point there he had actually left the airport, they would have detained him? In other words, didn't they say something to that effect? I don't recall. They had no intent that he was ever leaving that airport without them. Airport of a taxi stand? Yes. I mean, the area of the airport. I think there was, it may not have been said, that perhaps was a consideration if he ultimately tried to leave. And I believe, under the Woods case, which I cited in my brief, the Ninth Circuit Woods case, a subjective intent to detain does not arise to the level by itself of a Fourth Amendment seizure. So, I mean, this whole following scenario was sort of interesting, because I haven't really seen case, or close, very close following. They weren't trying to hide themselves at all. They were next to him. Well, they were following behind him, and I just want to address that point. They were not very close to him. They were behind and to the side, such that the defendant had a clear path of travel on his own. It was not a situation where they were overhearing what defendant, were so close they were overhearing what defendant was saying. Remember, defendant had made two inconsistent statements to the police officers. He said, my mother is picking me up, then I'm going to be picked, then I'm going, I need a taxi. Then he himself realized that, and as Judge Seabright made a specific factual finding to cover this potential inconsistency, he went to the charade of that cell phone call to his ma, saying, ma, I don't need a taxi. And, of course, it was the intended audience of that, but the officers to try and allay their suspicions from his inconsistency. It's fairly speculative. I mean, it could be. But, I mean, I'm more impressed with the fact that his, that either of those statements is inconsistent with his explanation for. That's correct. Going to the truck than I am with any inconsistency between the two statements. Correct. But I think in terms of, in terms of the defense, defendant saying, that's how close they were. No, that's not the case. It wasn't a question of them being so close to overhear. It's that they, that defendant wanted them to hear what he was saying on the cell phone to allay their suspicion. The point I would make is that it's important, and the concern I had was, when this case was argued before the district court, the whole issue presented by a defendant at that point was there was no reasonable suspicion to detain at the taxi stand. When this comes on appeal now, the defendant tried to move that back to an earlier period of time, which I believe is precluded for two reasons. Number one, unless the court, unless, this is here on a conditional plate, and that was not really part of the record, that was not part of the argument that was made before the district court, and that was not, in my own view, and based upon the case I cited, that is not preserved, or that particular argument to say that the detention occurred before the taxi stand is not preserved for appeal. It's not part of the conditional plea in this case. And even if it was. What does the conditional plea agreement say? Do you have a handy? No, the conditional plea, the reservation, Your Honor, is in my supplemental excerpt of the record. Because that was not included, so I wanted that part of the record. It's a reservation of his rights, supplemental excerpt, page 64. The specific reservation is, and I quote from SCR 65. I hereby give notice of my intent to enter a conditional plea of guilty to the charge in the indictment, also expressly reserving my right to appeal the district court's order. The order was specifically defined. I see. Well, that's interesting, because he didn't actually reserve the suppression issue in general. He preserved the right to appeal the order. Correct. But the order, and the order found that, as argued in the case in the district court below, as argued there, that the detention, was the detention, was there reasonable suspicion to support the detention as of the taxicab stand. The other thing that the court did make a specific finding on, factual finding on, that there was no detention until the taxicab stand. Everything prior to that was a consensual encounter. So even if this court should find somehow that procedurally, defendant may make this argument here, the problem remains that there was a specific factual finding that whatever happened prior to the taxi stand was a consensual encounter, and it is not clear, and I would suggest to the court, it is not, that finding was not clearly erroneous, and defendant has not made any showing why the consensual encounter determination by the court before the taxicab stand. Well, it was, I mean, the period, it's kind of strange, but the period between when he left the baggage area and when he got, and when he had entertained the tax, it wasn't a consensual encounter. It just, on this theory, it just wasn't an encounter. I mean, it's not that it was. Correct. Right? I mean, it wasn't that he consented to them following him. Correct. But there was nothing. The point I am making, Your Honor, is that prior to the detention, there was no, there was no detention, as the court, district court found, there was no detention whatsoever before the, before the taxicab stand and defendant attempted to get into the taxi to leave. Suppose we conclude that the encounter at the baggage area was consensual and that he was briefly detained and then permitted to leave. That would not be inconsistent with, I don't think that's what happened. I think the facts are that it was a consensual encounter. Well, but he also was detained while they searched.  He gave consent. He gave consent. It was not that long. He wasn't free to leave then. He was free to leave at that point, Your Honor. Prior to the search? You mean, you're talking about the search of his bags in baggage claim. Yes. He was free to leave at that point if he wanted to. I presume as a practical matter, he didn't really want to because they were his bags. And it looked as if the officers were going to search it very quickly at the scene in front of him so he was willing to stay. Well, he wasn't worried about what they were going to find in it. Well, that's true, too. So I don't think, I don't think, one, you could. I guess what I'm really saying to you is, is the material in deciding this case, whether he was detained at the baggage area or not. No. It is not. He was allowed to leave. That is correct. At that point in time, yes. Now, I think the other aspect that's important here is in the context of what happens, defendant goes to the taxi cab stand. By this point in time, what the officers are aware of is defendant does not want them to know where his pickup truck is or that he has the pickup truck or that is his intended means of transportation. And up to that point in time, from what the officers saw, everything that defendant did indicated that he was going to use that pickup truck to leave the airport. He had moved it from that distant location closer to baggage point to be able to get his heavy bags there. And now, all of a sudden, defendant is not telling them. He's saying, I'm going to take a taxi. I'm sorry. He says initially, my mother is going to pick me up. Explanation number one. Explanation number two, I'm going to take a taxi. Then once he's detained, explanation number three, I need a vehicle to pick up my mother, which is totally inconsistent with everything else. And so by this time at the taxi cab stand, there is a serious question in the officer's mind, why is this man trying to desperately hide the truck or what is there in that truck that he's desperately trying to hide? And it is at this point that the importance of the confidential informant tip that they had received earlier becomes a very, very plausible explanation for defendant's conduct. That tip was that he was body carrying the drugs in because he could not get it. He could not get a courier to bring it in for him because the defendant had to come to his brother's sentencing that afternoon. And that while he was sitting in that truck, that five-minute interval after he moved the truck, as he was sitting and as Officer Jones said, fidgeting in the truck, he had removed the drugs and placed them in the truck. And that was the most plausible explanation for defendant's conduct of why he did not want the officers to know about that truck. And that gave rise at that point to the reasonable suspicion to detain him and the officers did exactly the right thing. Subsequent to that, defendant initially said, using his colorful language, you know, I don't want you to search my truck. He clearly knew his rights. The officers respected that. At that point in time, they were going to go and get a search warrant for that truck. Defendant then changed his mind. The officers then went back and said, is this really what, Agent Jones went back to specifically ask him, what happened? Do you really want to change your mind? He said no before. Do you want to change your mind? He said yes. They did effect then a consent search of that truck. The officers had more than enough suspicious information to discount the lack of a dog alert because the drugs had not been in that truck that long. That drug was airtight and the truck was airtight and sealed because he had rolled the windows up. A dog could not alert to the order of narcotics that had not diffused out of that truck. So it was reasonable for the officers to think that way. And they didn't back search the truck. Last question. Just because it's been said, I don't know how much it matters. Where in the district court opinion did he find that there were He certainly found that the interaction at the baggage claim was a consensual encounter. But did he ever make a finding about anything after that? Yeah. If I may, Your Honor. Short of the taxicab. Do you have If you look at the order at Excerpt of Record 14. I'm looking at the order. Excerpt at page 14. And there is this quotation there. Page 14. Okay. Though his interaction with Kobayashi and Nakasone started as a consensual encounter, that encounter turned into a detention where Kobayashi instructed Nielsen to step away from the taxicab stand. Okay. Thank you very much for your argument. It was a useful argument. Yes. Ms. Tomashiro. Real quick. Oh, you had a question? No. Go ahead. A minute and a half. Okay. Just real quick. You know, the Woods case that's cited by the government, you know, I think is distinguishable from this case. You know, I guess what troubles me in this case is it appears the cops had two bites at the apple here. They have the consensual encounter. Nothing's found in the bags. And then according to the transcript. They actually didn't expect anything to be found in the bags. That's what it turns out. Right. So he's free to go, right? And then what the officer does on the transcript of the proceedings at page 93, which is a part of the defendant's or appellant's excerpts of record, it's towards the back. So he's free to leave. He starts going. And the officer says, I'm sorry. The officer says, who's going to pick you up or ask him how he was leaving the airport? And so, you know, they pick up again. The consensual encounter is pal. I mean, Mr. Nielsen should be free to leave. But the officers engage him again. And I guess it's my argument that they engage him in a different, a new subject about how he's now going to leave the airport. But aren't they in a public place and isn't he free not to answer any questions? Police officers can talk to anybody on the street. You don't have to answer. Yes, that's true. I mean, but I guess my point is once you're free to leave, you know, the law enforcement should not be able to then re-engage you in the absence of reasonable suspicion. So it's like they get two lights. Thank you. United States v. Nielsen is submitted. And we will go to the last argued case of the day.
judges: Alarcon, Berzon, Tallman